**FIRST CHICAGO INTERNATIONAL, Plaintiff,**

v.

**UNITED EXCHANGE COMPANY, LTD., et al., Defendants.**

**Civ. A. No. 86–0437.**

United States District Court,
District of Columbia.

Feb. 20, 1987.

David Shapiro, John Kotelly, Peter Kadzik, Dickstein, Shapiro & Morin, Washington, D.C., for plaintiff.

Edmund E. Harvey, Patricia A. McClary, Chadbourne & Parke, Washington, D.C., for defendant United Exchange Co.

Stephen P. Kling, John K. Crummey, Crummey & Kling, Washington, D.C., for defendant Othman Abu Samra.

Eugene M. Propper, Dwight D. Meier, Barbara Sarshik, Lane & Edson, P.C., Robert C. Zimmer, Eckert, Seamans, Cherin & Mellot, Washington, D.C., for defendants Petra Bank and Petra Intern. Banking Corp.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

This case, together with an application for writ of attachment, was filed by The First Chicago International Bank ("First Chicago"). That bank is a subsidiary of the First National Bank of Chicago ("FNBC"); its principal place of business is New York City. First Chicago sought to attach assets of a Jordanian currency exchange, United Exchange Company, Ltd. ("UNEXCO"), and of six officers or employees of UNEXCO ("individual defendants"). A business, Jamal Abu Samra Est., owned and operated by one of the individual defendants, Jamal Abu Samra, is also a named defendant. The individual defendants are, with one exception, all members of the Abu Samra family.

The writ was directed against Petra International Banking Corporation ("Petra International"), a Washington-based subsidiary of Petra Bank ("Petra"), a Jordani-

an banking concern. Petra International and Petra were also named as defendants in the complaint. First Chicago charges that UNEXCO and the individual defendants, with the aid and cooperation of Petra International and Petra, defrauded it of more than $23 million, by means of a check-kiting scheme involving transfers of funds between accounts at Petra International in Washington and First Chicago in New York.

The Court granted plaintiff's application for writ of attachment on February 19, 1986. At the time that the writ was served, Petra International had some $1 million on deposit in the name of UNEXCO, subject to a set-off in a like amount. A far lesser sum was recovered from the account of one of the individual defendants, Othman Abu Samra ("Othman").

After plaintiff pursued limited discovery, defendants UNEXCO and Othman moved to dismiss the complaint for lack of personal jurisdiction, improper service of process, and *forum non conveniens*. Petra International and Petra joined in seeking dismissal on grounds of *forum non conveniens*, but otherwise conceded that this Court had jurisdiction over their persons. The remaining individual defendants moved to stay the action as to them, pending resolution of the dispositive motions. In addition, the moving defendants, along with several of the other individual defendants, sought a protective order, relieving them of the need to respond to further discovery pending consideration of the motions to dismiss.

Oral argument on the dispositive motions was heard after extensive briefing by the parties. For the reasons set forth below, the Court grants the motions to dismiss of UNEXCO and Othman.

Following oral argument, Petra International and Petra filed a supplemental motion to dismiss for failure to state a claim upon which relief could be granted. Those defendants argue that, just as plaintiff has not made a prima facie showing as to the jurisdictional facts at issue, neither has it demonstrated any facts implicating them in

any wrongdoing as to the merits of its claims. The Court agrees that to hold that plaintiff has failed to demonstrate the existence of threshold jurisdictional facts is also to hold that it has failed to state a claim against Petra and Petra International. Accordingly, the Court grants the motion of those defendants to dismiss the complaint as to them under Fed.R.Civ.P. 12(b)(6).[1]

In view of the disposition of the motions to dismiss, the pending motions to stay and for entry of a protective order are denied as moot.

## BACKGROUND

The relationship between First Chicago and UNEXCO began in 1983, when UNEXCO opened a checking account with the bank. The two defendants assert without any challenge from plaintiff, that this relationship was entered into when a First Chicago representative solicited UNEXCO's business in Amman, Jordan. Plaintiff does not assert that UNEXCO representatives travelled to New York for the purpose of meeting with the bank's personnel concerning the account. Because UNEXCO had been a longstanding customer of Petra, First Chicago wired Petra in Amman, inquiring of UNEXCO's reputation and creditworthiness. Petra responded, by telex to First Chicago, indicating that both were good. First Chicago made a similar inquiry some time later and received the same response. Petra's telex replies made it clear, however that the representations were made without guarantee or responsibility.

On or about October 1983, Petra opened the offices of Petra International in Washington. Sometime later, UNEXCO and several of the individual defendants opened checking accounts at Petra International. From June 1983 until mid-January 1986, UNEXCO's account at First Chicago saw a great deal of activity. In April 1985, First Chicago extended a $900,000 line of to UNEXCO credit in exchange for a cash time deposit of $1 million as security.

---

1. Pursuant to Rule 12(b), because matters have been presented to the Court outside the pleadings, defendants' motion to dismiss will be treated as one for summary judgment under Rule 56.

Plaintiff alleges that between September and December 1985, defendants engaged in a check-kiting scheme involving the transfer of large sums of money between accounts at First Chicago and Petra International. *See* Affidavit of Richard J. Gilgan ¶ 10 (June 23, 1986), attached as Ex. A to plaintiff's opposition to defendants' motions to dismiss ("Gilgan Aff.").[2] Plaintiffs allege two distinct patterns of kiting activity. Under the first, UNEXCO drew checks on its account at First Chicago payable to Petra and to a Hani Kattan. Kattan and Petra then deposited the monies into their respective accounts at Petra International. Alternatively, Kattan might endorse checks over to Petra, which would then deposit the funds in its Petra International account. Petra then wired funds directly or indirectly into UNEXCO's account at First Chicago, while Kattan wrote checks on his Petra International account payable to Jamal Abu Samra Est., a business owned by one of the individual defendants,[3] which then endorsed them over to UNEXCO for deposit in its account at First Chicago. Gilgan Aff. ¶¶ 11–13. Under the second pattern of activity, UNEXCO would write checks to various third-parties, who would then endorse them over to Jamal Abu Samra Est. for deposit in its account at Petra International. Jamal Abu Samra Est. would then reverse the process, resulting in deposits in UNEXCO's account at First Chicago. Gilgan Aff. ¶¶ 14–16.

Plaintiff contends that the above described transactions enabled defendants to make it appear as though their accounts at First Chicago and Petra International were far larger than they in fact were. As a result, says plaintiff, Jamal Abu Samra was able, at the end of December 1985, to draw 29 checks totaling some $28 million on the Jamal Abu Samra Est. account at Petra International, payable to various individuals. Those checks were then endorsed over to UNEXCO, which deposited them in its account at First Chicago. Plaintiff alleges that defendants knew at the time the checks were written that they were not backed by sufficient funds in the Jamal Abu Samra Est. account at Petra International. At about the same time that those checks were written, defendants Othman and Sami Abu Samra wrote numerous checks on the UNEXCO account at First Chicago.

On January 3, 1986, plaintiff received notice from Petra International that it was dishonoring the 29 checks written on the Jamal Abu Samra Est. account. As a result, UNEXCO's account with plaintiff became overdrawn by over $23 million. Plaintiff asserts that Petra International "play[ed] an important role" in the success of the check-kiting scheme. Gilgan Aff. ¶ 22. Yet plaintiff's own description of that role indicates only that funds were transferred into and out of accounts maintained by others at Petra International. *Id.* Neither UNEXCO nor any of its principals maintained accounts at Petra International that were alleged to have been involved in the scheme. *See id.* ¶¶ 11–16.

Subsequent to the discovery of the overdraft, plaintiff met with members of the Abu Samra family to discuss the problem, as well as with representatives of Petra. Those discussions did not result in evidence that either Petra or Petra International were involved in the alleged check-kiting conspiracy.

## ANALYSIS

### I. *Personal Jurisdiction*

■ In analyzing whether the forum court can properly exercise personal jurisdiction over a given defendant, one must look both to the local long-arm statute and to the provisions of the due process clause of the fourteenth amendment. The District of Columbia long-arm statute[4] provides that a local court may exercise jurisdiction over a non-resident defendant who transacts business or who causes tortious injury in the District by an act or omission in or outside of the District. D.C.Code § 13–

---

**2.** Mr. Gilgan is a vice president of FNBC with responsibility for check-clearing operations.

**3.** *See supra* p. 788.

**4.** D.C.Code §§ 13–421—424 (1981).

423(a)(1), (3), (4). While the "transacting business" provision of the statute has been held to extend jurisdiction to the furthest limits recognized by due process, *Chase v. Pan-Pacific Broadcasting, Inc.,* 617 F.Supp. 1414, 1420 (D.D.C.1985); *Mouzavires v. Baxter,* 434 A.2d 988, 990–93 (D.C. 1981), the District of Columbia Court of Appeals has apparently reserved the question of whether any other provision is coextensive with due process. *See Reuber v. United States,* 750 F.2d 1039, 1050 n. 13 (D.C.Cir.1984); *Mouzavires,* 434 A.2d at 991–92. Yet because the Court finds that an exercise of its jurisdiction over defendants would offend due process, it need not consider whether an assertion of jurisdiction would independently exceed the scope of the District of Columbia long-arm.

One additional remark must be made concerning the operation of the long-arm statute. The bases for jurisdiction enumerated in D.C.Code § 13–423(a) apply only to claims "arising from" conduct described therein. Section 13–423(b) makes this point expressly clear. Where jurisdiction is sought over a defendant as to a claim that does not "arise from" that defendant's activities within the forum state, as allowed by § 13–422,[5] those activities must be greater in scope before an exercise of jurisdiction over the defendant will be constitutionally permissible. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473 n. 15, 105 S.Ct. 2174, 2182 n. 15, 85 L.Ed.2d 528 (1985) (discussing "general" jurisdiction). It is not argued that any of the defendants come within the scope of § 13–422; therefore, analysis of long-arm jurisdiction will be confined to what contacts of defendants with the District could be said to give rise to the claims charged in plaintiff's complaint.

### A. *Jurisdiction as to Othman*

 To the extent that Othman is sued in his individual capacity for alleged wrongs, he must be shown to have had his own contacts with the District before a court here could assert jurisdiction over

him. *Trager v. Wallace Berrie & Co., Inc.,* 593 F.Supp. 223, 225–26 (D.D.C.1984); *Security Bank, N.A. v. Tauber,* 347 F.Supp. 511, 516 (D.D.C. 1972). Yet Othman did not have any contacts with the District at the relevant time, save an account at Petra International that is not said to have been involved in the alleged check-kiting scheme. Because that account is not involved in any claim at issue here, it cannot form the basis of jurisdiction over Othman under § 13–423(b).

If Othman is sued as an agent for UNEXCO, it is doubtful that jurisdiction may be asserted as to him merely because jurisdiction is exercised over his principal. *See Shaffer v. Heitner,* 433 U.S. 186, 215–16, 97 S.Ct. 2569, 2585–86, 53 L.Ed.2d 683 (1977) (officers or directors of Delaware Corporation not subject to jurisdiction of a Delaware court merely by virtue of their positions). In any event, to the extent that jurisdiction may not be asserted over UNEXCO, *see* discussion *infra,* section C, it may not be exercised over Othman under such a theory.

Finally, insofar as plaintiff relies upon a "conspiracy" theory of jurisdiction to tie all the defendants to the District of Columbia, jurisdiction may not be asserted as to Othman because, as set forth below, the record does not reveal any connection between such an alleged conspiracy and the District.

### B. *Jurisdiction as to UNEXCO*

#### 1. *Transacting business*

 D.C.Code § 13–423(a)(1) provides that a local court may have jurisdiction over a person as to a claim arising from that person's "transacting any business in the District of Columbia[.]" As noted above, this provision of the long-arm statute has been interpreted to be coextensive with due process. In view of that interpretation, plaintiff has cited a number of cases for the proposition that a non-resident defendant may be subject to jurisdiction in the District arising from the transaction of

---

**5.** Section 13–422 provides that "[a] District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief."

business here, even though he has never been physically present.

A look at *First American Bank, N.A. v. United Equity Corp.*, 89 F.R.D. 81 (D.D.C. 1981), a case upon which plaintiff places considerable reliance, would be instructive. The corporate defendant in that case, a Delaware concern with its principal place of business in Florida, contracted for a $140,000 loan on a promissory note. The note was executed, delivered and partly discharged in the District. In denying the defendant's motion to dismiss,[6] the court found that the defendant "projected its presence into the District in furtherance of its own essential business purposes[,]" and thus rendered itself amenable to service of process. 89 F.R.D. at 85. The requirement that a non-resident defendant take such affirmative steps towards injecting itself into the forum state before jurisdiction over it may be had has recently been reaffirmed by the Supreme Court in *Burger King*. There the Court held that a Michigan resident was subject to the jurisdiction of a Florida court as to a claim arising from a franchise agreement entered into between the two parties. Central to the Court's holding was the fact that the Michigan defendant had entered into a "carefully structured ... relationship that envisioned continuing and wide-reaching contacts with [the forum state]." 471 U.S. at 480, 105 S.Ct. at 2186. Hence, even though the defendant maintained no physical presence in the forum state, he could be said to have "purposefully directed" his activities towards that state, thus subjecting himself to jurisdiction there. *Id.* at 476, 105 S.Ct. at 2184.

*Catalyst Energy Development Corp. v. Iron Mountain Mines, Inc.*, 630 F.Supp. 1314 (S.D.N.Y.1986) is another citation relied upon by plaintiff for jurisdiction over a defendant who had no physical contacts with the forum state. The defendant, a California corporation, executed a note in California in exchange for a loan from a New York corporation, the proceeds of which were to be used to finance a hydroelectric project in California. The defendant directed the plaintiff to deposit a portion of the note proceeds in the defendant's New York City bank account. The court held that that request constituted a "purposeful transaction" that "call[ed] for the plaintiff to perform activities in [the forum state] for the benefit of the defendant." 630 F.Supp. at 1316 (quoting *Wichita Federal Savings & Loan v. Comark*, 586 F.Supp. 940, 944 (S.D.N.Y.1984)). In addition, the court stressed that the relevant transaction was the borrowing of money, not the execution of the note, and that the loan transaction took place in New York. *Id.* (citing *Sterling National Bank & Trust Co. v. Fidelity Mortgage Investors*, 510 F.2d 870 (2d Cir.1975)).

A third case relied upon by plaintiff, *Mouzavires v. Baxter*, 434 A.2d 988 (D.C. 1981), merits discussion. A Florida law firm contacted a District of Columbia lawyer and, through extensive telephone discussions and correspondence, engaged the lawyer to assist the firm in the conduct of some specialized litigation pending in Florida. When a dispute arose as to the compensation due, the lawyer sued in District of Columbia Superior Court. In reversing that court's order quashing service of process, the District of Columbia Court of Appeals held that the Florida law firm established "deliberate and voluntary" contacts with the District. 434 A.2d at 997. The fact that the defendants initiated a contractual relationship that they knew "had a substantial connection with the District and which they foresaw would have consequences here, *id.*, was crucial to the appellate court's determination.

What is significant about the above-cited cases is that, in each, the transactions or relations involving the parties were centered—or at least in part were directed toward—the plaintiff's home state. In this proceeding, that jurisdiction is New York.

---

**6.** The theory behind the defendant's motion to dismiss was that, because it did not "transact business" within the District, it could not be summoned through service upon the Superintendent of Corporations, pursuant to D.C.Code § 29–933i(c) (1973) (now D.C.Code § 29–399.-9(c) (1981)). The court held that it did transact business within the meaning of that provision and for purposes of long-arm jurisdiction under D.C.Code § 13–423(a)(1).

Plaintiff seeks, however, to have this Court exercise jurisdiction over defendants as to claims allegedly arising out of their transaction of business in the District of Columbia. Yet neither UNEXCO nor Othman maintained a bank account in the District relevant to this suit. Nor is it alleged that they transacted any business here relevant to plaintiff's claims. After one carefully parses the complaint, it is clear that plaintiff is really complaining about UNEXCO's overdraft in New York and Petra International's dishonor of certain checks in Washington. There is, in short, no basis on which to hold that either UNEXCO or Othman "purposefully directed" their activities in any way towards the District, so as to confer jurisdiction over them upon this Court.

### 2. *Tortious injury*

The local long-arm statute provides that one who "caus[es] tortious injury in the District of Columbia by an act or omission in the District ..." may be subject to the jurisdiction of a court sitting here. D.C. Code § 13–423(a)(3). In addition, one who "caus[es] tortious injury in the District of Columbia by an act or omission outside the District ..." may be amenable to suit here "if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District...." *Id.* § 13–423(a)(4). To the extent that neither UNEXCO nor Othman can be said to have "transacted business" within the District, they certainly cannot be held to have satisfied the "persistent course of conduct" standard of section 13–423(a)(4), which appears to require a more regular course of dealings than section 13–423(a)(1). *See Security Bank*, 347 F.Supp. at 515. What is left, then, as a possible predicate for jurisdiction is the commission of tortious injury within the District by an act or omission occurring here as well.

Plaintiff argues that it was injured here when Petra International dishonored the 29 checks payable to UNEXCO and that the acts giving rise to that injury occurred each time a bad check was written on an account at either Petra International or First Chicago and deposited in the other bank. Leaving aside the plausibility of plaintiff's "conspiracy" theory, which will be considered later, plaintiff has failed to connect the alleged acts and injuries to the District of Columbia. The real hurt felt by plaintiff occurred in New York, when plaintiff discovered that UNEXCO's account was seriously overdrawn. While it is possible to suffer injury in more than one jurisdiction, it cannot be said that plaintiff was also injured in the District when Petra International dishonored the checks presented to it. The dishonor of checks backed by insufficient funds, without more, is simply not a tortious act. That being the case, such action cannot give rise to any injury. And if no injury occurred in the District, there is no basis for jurisdiction here.

Plaintiff's contention that tortious acts occurred in the District whenever an allegedly bad check was written on or was deposited in an account at Petra International fares no better. Such a theory simply proves too much. It would mean that a plaintiff bank such as First Chicago could sue a defendant such as UNEXCO in any jurisdiction in which it maintained a checking account upon which it drew funds or in which it deposited monies received. Such a theory produces even more bizarre results when applied to the particular facts of this case. The only District of Columbia accounts relevant to plaintiff's claims are those maintained at Petra International by Petra, Jamal Abu Samra Est., and Hani Kattan. No account maintained by UNEXCO at Petra International is said to have been involved. Subjecting a non-resident defendant to jurisdiction in any state in which its checks were deposited or from which checks were sent to it would run against the grain of minimum contacts doctrine as established by the Supreme Court. This is especially true when one considers that UNEXCO is not alleged to have sent *any* checks directly to Petra International. In short, there is no connection between the District of Columbia and any allegedly bad checks written by any party sufficient

to give rise to jurisdiction here over UNEXCO.

### C. *Plaintiff's Conspiracy Theory*

As noted earlier, plaintiff seeks to tie its claims to the District by alleging that the parties were involved in a check-kiting "conspiracy" and that, therefore, the actions of any conspirator within the District can be imputed to each of the other co-conspirators, thus subjecting them to jurisdiction here. As authority for that proposition, plaintiff relies heavily upon *Mandelkorn v. Patrick*, 359 F.Supp. 692 (D.D.C. 1973). In *Mandelkorn*, however, the court premised its exercise of jurisdiction over the non-resident conspirators at least in part upon the commission of an overt act in furtherance of the conspiracy in the District that resulted in injury in the District. *See also Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144, 151 (D.D.C. 1976). The *Mandelkorn* court also stressed that its decision might well have been different if the facts underlying the conspiracy were controverted. 359 F.Supp. at 697.

■ Plaintiff First Chicago could be said to have been injured in the District only if the dishonor of the checks by Petra International was wrongful and done in furtherance of the conspiracy. Yet while plaintiff has asserted in oral argument that it is willing to rest on the present record in demonstrating Petra International's complicity in the check-kiting scheme, that record contains nothing that implicates the bank in any wrongdoing. Indeed, the only references to Petra International that occur for the most part exonerate that defendant from the charges leveled at it. A former employee of First Chicago, Rafael Kamar, stated that one of the individual defendants with whom he met in Amman, subsequent to the discovery of the overdraft, acknowledged that UNEXCO was in the business of "floating checks." Deposition (July 1, 1986) at 50–51, 61–62. Kamar, when asked, stated however that he was told that Petra and Petra International were *not* involved in this business. *Id.* at 75, 194. If that is the case, then the only

inference that can be drawn from Petra International's dishonor of the checks is that the bank was simply taking what measures it could to avoid financial loss to it. Such action, standing alone, is not wrongful, *see Mid-Cal National Bank v. Federal Reserve Bank*, 590 F.2d 761, 762 (9th Cir. 1979), and thus cannot be said to have caused any injury within the District upon which a "conspiracy" theory of jurisdiction may be based.

It might be argued that, regardless of whether Petra International was itself implicated in the alleged check-kiting scheme, the remaining defendants may have been engaged in a conspiracy that utilized the services of the bank an unwitting intermediary. In answer, two points must be made. First, while it is true that a plaintiff need only make a prima facie showing as to the pertinent jurisdictional facts in order to survive a motion to dismiss, *Chase*, 617 F.Supp. at 1415 n. 1; 4 Wright & Miller, Federal Practice and Procedure: Civil § 1068 at 250 (1969), it appears from the present record that plaintiff has not even done that. Although Mr. Kamar was deposed as stating that one of the individual defendants admitted that they were in the check-floating business, Deposition at 50–51, 61–62, those admissions or statements appear to concern activity ongoing only within Jordan. Moreover, Kamar stated that five or six times during 1985, but prior to the kiting activity complained of, First Chicago was on notice that UNEXCO's account was overdrawn, sometimes by more than $15 million. *Id.* at 81–82. Moreover, defendants contend, and plaintiffs apparently concede, that First Chicago's records reveal UNEXCO overdrafts of some $8–14 million throughout December 1985. Not only would the existence of such overdrafts render the kind of scheme that plaintiff alleges unnecessary, but by definition it would make the scheme unworkable. As plaintiff's Mr. Gilgan points out, the success of a kite depends upon the kiter's ability to inflate the balances in each of the accounts involved. Gilgan Aff. ¶ 6. Obviously, if one of the accounts shows a substantial overdraft, such a scheme will not be effective.

■ Even if plaintiff could demonstrate conclusively that defendants, other than Petra or Petra International, were engaged in a check-kiting conspiracy, the existence of such a scheme alone would not form the basis for jurisdiction in the District as to a claim arising therefrom. To the extent that Petra International is not implicated in the alleged conspiracy, the most that could be said is that checks involved in the scheme passed through and were negotiated in the District. Yet that occurrence was entirely fortuitous and thus cannot establish jurisdiction over a non-resident defendant. *See Burger King,* 471 U.S. at 474–75, 105 S.Ct. at 2183. The checks could just as easily have passed through Chicago, or San Francisco, or even Zurich or Bonn. Indeed, the checks did move through the Baltimore branch of the Federal Reserve Bank of Richmond. Yet no one suggests, and indeed it would be improper to hold, that jurisdiction over these defendants lies in the District of Maryland.

■ In short, with Petra International removed from the picture, there is absolutely no basis on which to exercise jurisdiction over the non-resident defendants.

## II. *Motion to Dismiss of Petra and Petra International*

Based upon the apparent lack of record support for plaintiff's "conspiracy" theory of jurisdiction, Petra and Petra International have moved to dismiss the complaint as to them for failure to state a claim upon which relief can be granted. In view of the foregoing, that motion appears well taken. As stated previously, plaintiff has indicated that it is willing to rest on the present record in its attempt to link those defendants with the alleged check-kiting scheme. Yet the present record shows that neither defendant had any connection with any such conspiracy and that it may be doubtful that such a conspiracy even existed. While ordinarily the facts alleged in a complaint will be accepted as true for purposes of resolving a motion to dismiss, *see Gregg v. Barrett,* 771 F.2d 539, 547 (D.C.Cir. 1985); *Doe v. United States Department of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.

1985), in the absence of any facts of record supporting a claim for relief, the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). And although Petra and Petra International have not moved for summary judgment, their motion to dismiss may be treated as such under Fed.R.Civ.P. 12(b), if the court considers matters outside the pleadings. Having done so, the court cannot discover any evidence that overcomes the implausibility of plaintiff's assertions, rendering summary judgment appropriate. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 1360–62, 89 L.Ed.2d 538 (1986).

In an effort to keep its cause of action against Petra and Petra International alive, plaintiff claims that the existence of the following factual disputes renders entry of summary judgment for those defendants inappropriate:

(1) that Petra and Petra International were in fact engaged with the other defendants in a check-kiting conspiracy;

(2) that First Chicago relied on the telexes sent by Petra in response to First Chicago's inquiries about UNEXCO's creditworthiness;

(3) that the telexes were false and were designed to assist in the success of the alleged conspiracy; and

(4) that Petra knew that UNEXCO had attempted to corrupt a First Chicago employee.

*See* Plaintiff's Statement of Material Facts as to Which There is a Genuine Dispute, filed pursuant to Local Rule 108(h) ("SMF").

■ The first of these "facts" is not a fact at all, but a conclusion. Moreover, it is a conclusion unsupported by any record evidence, as discussed *supra.* The second fact does not, as a matter of law, support an inference that either Petra or Petra International was engaged in a scheme to defraud plaintiff. If, indeed, First Chicago relied upon the telexes, such reliance was unreasonable. The telexes stated on their

face that the information contained therein was furnished without guarantee or responsibility. Such a disclaimer of liability is sufficient to put a party requesting the information in question on notice that the response should only be taken for what it is worth. *See Central States Stamping Co. v. Terminal Equipment Co.,* 727 F.2d 1405, 1409 (6th Cir.1984). Even if that were not the case, the fact that overdrafts of UNEXCO's account occurred prior to the November 1985 credit inquiry would render reliance upon the second telex unreasonable.

Similarly, the allegation that Petra deliberately furnished First Chicago with false credit information about UNEXCO rings hollow. The information was not volunteered by Petra, as one might expect if it were Petra's plan to "lull plaintiff into a false sense of security," SMF ¶ III.A, but rather was requested by First Chicago. Moreover, if Petra wanted to affirmatively deceive First Chicago regarding UNEXCO's creditworthiness, it would not have sent reports that stated on their face that they were made without guarantee or responsibility. Finally, even plaintiff's deponent Kamar denied hearing that either Petra or Petra International was involved in any check-kiting conspiracy with the other defendants. Deposition at 75, 194.

The last allegation in plaintiff's statement of material facts in dispute is just that—a bare allegation. Plaintiff claims that Petra knew that UNEXCO had sent a Mercedes automobile to a First Chicago employee with responsibility for the UNEXCO account. Yet plaintiff has adduced no evidence to indicate that Petra knew of this situation during the time that the alleged kite was in operation. *See* Affidavit of Don W. Feeley (Oct. 7, 1986) ¶¶ 4–5.[7] In contrast, Petra has submitted sworn testimony that it was not until after First Chicago filed its complaint that Petra learned that UNEXCO had sent the automobile to the employee. Affidavit of Mohamed R. Chalabi (Oct. 16, 1986) ¶ 2. Even if Petra knew of the gift during the alleged

conspiracy, plaintiff has offered no evidence suggesting that the gift was a bribe, that it was made in furtherance of the alleged kiting scheme, or—most importantly—that it was made with the approval of Petra. In short, plaintiff's allegation, even if true, proves nothing.

 In view of the absence of any record evidence implicating Petra or Petra International in any wrongdoing, the Court has no choice but to grant the motion of those defendants to dismiss the complaint as to them.

## CONCLUSION

For the reasons set forth above, it is clear that this Court does not have jurisdiction over the non-resident defendants. It is also clear that plaintiff has not stated a claim as to Petra and Petra International sufficient to withstand summary dismissal. Accordingly, this matter shall be dismissed as to defendants UNEXCO, Othman Abu Samra, Petra Bank, and Petra International Banking Corporation.

An appropriate Order will be entered.

---

**7.** Mr. Feeley is an attorney for FNBC with responsibility for investigation of the UNEXCO overdraft.